IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | CR. NO.: 3:14cr429 |
| | |
| | 18 U.S.C. § 371 |
| v. | 18 U.S.C. § 1952(a)(3) |
| | 18 U.S.C. § 1505 |
| **JAMES R. METTS** | 18 U.S.C. § 1343 |
| **a/k/a "Jimmy Metts"** | 18 U.S.C. § 1346 |
| **a/k/a "Sheriff Metts"** | 8 U.S.C. § 1324(a)(1)(A)(v)(I) |
| **a/k/a "Lexington** | 8 U.S.C. § 1324(a)(1)(A)(iii) |
| **Sheriff"** | 18 U.S.C. § 2 |
| | |
| | **INDICTMENT** |

THE GRAND JURY CHARGES:

At all times relevant to this Indictment, unless otherwise stated:

1. Lexington County Sheriff JAMES R. METTS allowed friends to buy favors when he accepted cash to interfere in the identification and processing of certain illegal aliens.

**A. Individuals Involved in the Criminal Scheme**

2. The Defendant, JAMES R. METTS, was and is the Sheriff of Lexington County, South Carolina. METTS has served as the Sheriff of Lexington County since 1972. As the Lexington County Sheriff, METTS' official duties include overseeing county-wide law enforcement; running the

1

Lexington County Sheriff's Department; hiring, firing, and supervising deputies and other department employees; maintaining records; and coordinating with federal, state, and other local law enforcement. As Lexington County Sheriff, METTS is also responsible for operating the Lexington County Detention Center, which, among other things, accepts and houses individuals arrested in and around Lexington County.

3. From 2005 through 2013, Danny Frazier served as a member of the Lexington Town Council. As a favor, METTS hired Frazier as an employee of the Lexington County Sheriff's Department to serve as a "business liaison" in 2012.

4. Greg Leon was the owner and operator of several Mexican restaurants in and around Columbia, SC. In at least 2011, Leon employed illegal aliens in those restaurants.

**B. Section 287(g) Federal Immigration Cooperative**

5. U.S. Immigration and Customs Enforcement (ICE), an investigative agency in the Department of Homeland Security (DHS), enforces federal immigration laws as part of its homeland security mission.

6.    Section 287(g) of the Immigration and Nationality Act authorizes DHS to enter into written agreements with local and state law enforcement departments (such as a sheriff's department) to authorize the state or local department's officers to perform certain limited immigration functions. This agreement is entered pursuant to a joint Memorandum of Agreement (MOA). Under a 287(g) MOA, ICE provides certain law enforcement officers with the training, supervision, and authorization to identify, process, and detain illegal aliens they encounter within their jurisdictions as part of their law-enforcement activity. The purpose of this collaboration is to enhance the safety and security of communities by permitting the identification and processing of arrested illegal aliens so that those who pose a threat to public safety or a danger to the community can be removed.

7.    Designated state or local law enforcement officers under a Section 287(g) MOA become Task Force Officers with limited immigration enforcement authority. Immigration enforcement activities conducted by these 287(g) Task Force Officers must be supervised and directed by ICE supervisory officers (*i.e.*, an Enforcement Removal Officer (ERO) or

Supervisory Deportation Detention Officer (SDDO)). Participating 287(g) Task Force Officers are not authorized to perform immigration officer functions except when working under the supervision and direction of an ICE supervisor. While a participating local law enforcement department retains supervision outside immigration enforcement functions, the local department lacks authority to direct, control, or interfere with a 287(g) Task Force Officer's immigration enforcement functions.

8. In July of 2010, METTS, and the Lexington County Sheriff's Department, entered into a 287(g) MOA with ICE. The Lexington 287(g) program began shortly thereafter and was fully-staffed by early 2011. Under the 287(g) program, certain Lexington County Officers received training and became 287(g) Task Force Officers (also known as Designated Immigration Officers) for ICE. These 287(g) Task Force Officers were granted limited immigration authority under the 287(g) program.

9. Under the Lexington 287(g) program, the 287(g) Task Force Officers were provided daily with a Foreign Born Report, listing all potential illegal aliens who had been arrested and placed in the Lexington County Detention

4

Center. These suspected foreign-born arrestees were then screened to determine their proper identification based on biometric and biographical information. Properly identifying illegal aliens through the use of the computerized ICE system (referred to as ENFORCE/IDENT) permits ICE to understand an alien's immigration status in the United States, to know the alien's criminal background, and to track the alien in the future.

10. Pending this identity screening, a limited-term immigration hold or detainer was placed on each foreign-born arrestee by the 287(g) Task Force Officers. Absent ICE supervisory approval, all suspected illegal aliens were required to be processed by the 287(g) Task Force Officers through the ICE system (ENFORCE/IDENT). Each arrestee that was screened but not identified and processed as an illegal alien was recorded in an Interview Log along with the reason the arrestee was not identified and processed in the ICE system (ENFORCE/IDENT). If an arrestee was entered into ICE system (ENFORCE/IDENT), then the 287(g) Task Force Officer would record that arrestee in the Detainer Log. Each entry into the Detainer Log included an ICE case

number along with other information about the arrestee and the reason for his arrest.

11. Entering an illegal alien into the ICE system (ENFORCE/IDENT) was a crucial step in the immigration process. Entry into the ICE system included the use of IDENT, which permits an analysis of the illegal alien's biometric information (including fingerprints and photographs) to determine the true identity of the illegal alien as well as biographical information such as nationality, previous criminal convictions, presence on terrorist watch lists, and prior immigration encounters.

12. In processing an identified illegal alien, an ICE supervisor - not a 287(g) Task Force Officer - was required to determine the appropriate immigration treatment of the alien. Based on information from the ICE system (ENFORCE/IDENT), ICE determined whether the illegal alien had any aggravating circumstances - such as serious criminal convictions or prior deportations. If processing revealed that the alien lacked these aggravating circumstances, then the alien could be released by an ICE supervisor and required to report to immigration officials at a later time. If the ICE system revealed aggravating

circumstances, then only an ICE supervisor could require that the alien be detained beyond the time of the limited immigration hold.

13. Members of the Lexington County Sheriff's Department, including 287(g) Task Force Officers, lacked the authority to circumvent the Section 287(g) program. The 287(g) Task Force Officers were required to enter illegal aliens in the ICE system (ENFORCE/IDENT). An illegal alien that was not entered into the ICE system (ENFORCE/IDENT) would not be identified and processed by ICE, and ICE would not learn if the illegal alien had aggravating circumstances such as serious prior convictions.

### C. Sheriff Metts Allowed Friends to Buy Favors when Metts Accepted Cash in Return for Agreeing to Assist Detained Illegal Aliens

14. Beginning in or around September of 2011, METTS agreed with Frazier and Leon to use his position, power, and influence to affect the identification and processing of illegal aliens held in the Lexington County Detention Center. Based on that agreement, METTS directed and interfered, and attempted to direct and interfere, with the immigration enforcement activities of DHS, ICE, and the Lexington County officers serving as 287(g) Task Force

7

Officers. In return for his agreement and assistance, METTS accepted cash payments.

15. When METTS was informed of an arrest and detention of an illegal alien working for Leon, METTS would contact his command staff and other employees to instruct that preferential treatment be provided to those specific illegal aliens. In doing so, METTS was aware that Leon's employees were illegal aliens. For example:

    a. On late Friday night, September 2, 2011, Illegal #1 - an illegal alien employed by Leon - was arrested by West Columbia Police Department and transported to the Lexington County Detention Center, arriving on September 3. At the detention center, a 287(g) Task Force Officer placed an immigration hold on Illegal #1. After Labor Day, on Tuesday, September 6, 2011, at around 2:27pm, Danny Frazier used his cellphone to contact METTS on his cellphone. After the approximately nine minute call with METTS, Frazier then used his cellphone to call Greg Leon at approximately 2:36pm. At 3:01pm, METTS' then used his cellphone to call Frazier

on his cellphone for an approximately five-minute call. Then Frazier used his cellphone to call Leon on his cellphone at 3:09pm. During these calls and otherwise, Frazier informed METTS that one of Leon's employees - Illegal #1 - had been arrested and sent to the Lexington County Detention Center. METTS agreed to assist with the illegal alien. METTS subsequently informed Frazier that a hold had already been placed on Illegal #1 and instructed Frazier that Leon needed to be quicker in providing METTS with notice of an illegal alien's arrest. In return for METTS' agreement and attempted assistance, METTS accepted cash from Frazier that had been provided by Leon.

b. On Friday night, September 16, 2011, Illegal #2 - an illegal alien employed by Leon - was arrested by West Columbia Police Department and transported to Lexington County Detention Center. On the morning of September 17, 2011, Leon used his cellphone to contact Frazier. After Frazier and Leon spoke on their cell

phones at approximately 9:42am, Frazier used his cellphone to contact METTS on his cellphone at 9:48am. At approximately 9:52am, METTS then used his cellphone to call the Lexington County Sheriff's Department at 803-785-2400. Shortly thereafter, at 10:07am, a member of the Lexington County Sheriff's Department command staff used his cellphone to call METTS on his cell phone. METTS then called Frazier back via cellphone at approximately 10:11am and then immediately thereafter METTS called back to the member of the Lexington County Sheriff's Department command staff. Frazier then called Leon at 10:15am. During these calls and otherwise, Leon asked Frazier to contact METTS about Illegal #2's arrest and incarceration at Lexington County Detention Center. METTS agreed to assist with Illegal #2. Per METTS' intervention, Illegal #2 was not fully identified, entered into the ICE system (ENFORCE/IDENT), or processed to determine the appropriate immigration treatment. Instead, the

immigration hold was removed and Illegal #2 was released without being identified or processed by ICE. In return for METTS' agreement, assistance, and attempted assistance, METTS accepted cash from Frazier that had been provided by Leon.

c.  On Tuesday afternoon, November 8, 2011, Illegal #3 - an illegal alien employed by Leon - was arrested by West Columbia Police Department and transported to Lexington County Detention Center. On November 8-10, 2011, Frazier used his cell phone to communicate with Leon, METTS, and a member of METTS' Lexington County Sheriff Department command staff on their respective cellphones about Illegal #3. During these calls and otherwise, they discussed having Illegal #3 released and METTS agreed to assist. In return for METTS' agreement and attempted assistance, METTS accepted cash.

d.  On Sunday morning, November 13, 2011, Illegal #4 - an illegal alien employed by Leon - was arrested by West Columbia Police Department and

transported to Lexington County Detention Center. On Monday, November 14, 2011, at approximately 9:25am, Frazier called METTS concerning Illegal #4. METTS told Frazier to contact a certain member of the Lexington County Sheriff Department command staff on his cellphone. At 9:35am, Frazier contacted the member of the Lexington County Sheriff Department command staff on his cellphone. At 9:51am, the same member of the Lexington County Sheriff Department command staff called Frazier on his cellphone. Then, at 10:26am, Frazier called Leon on his cellphone. At 11:31am and 12:05pm, Leon called METTS on his cellphone. Leon met with METTS at the Lexington County Sherriff's Department; during this meeting, METTS accepted an envelope with cash in return for METTS' agreement, assistance, and attempted assistance with illegal aliens employed by Leon, including Illegal #4. Based on the intervention of METTS, and his staff, Illegal #4 was not fully identified, entered into the

ICE system (ENFORCE/IDENT), or processed to determine the appropriate immigration treatment. Instead, the immigration hold was removed and Illegal #4 was released without being identified or processed by ICE.

## COUNT 1
### (Conspiracy to Violate Federal Law and Interfere with Government Function)

16. The allegations set forth in paragraphs 1 through 15 are repeated and realleged as if set forth fully herein.

17. At times unknown to the grand jury, but beginning at least in or around September 2011, and continuing thereafter, up to and including the date of this Indictment, in the District of South Carolina, the Defendant METTS, Danny Frazier, Greg Leon, and others known and unknown knowingly and intentionally combined, conspired, confederated, agreed, and had a tacit understanding

a. **to commit the offense of Use of an Interstate Facility to Facilitate Bribery:** that is, to use a cellphone (*i.e.*, a facility in interstate commerce), with intent to promote, establish,

13

carry on, and facilitate an unlawful activity, to wit bribery in violation of the laws of South Carolina (SC Code §§8-13-705 and 16-9-220), and thereafter performed and attempted to perform an act to promote, establish, carry on, and facilitate the bribery, in violation of Title 18, United States Code, Section 1952(a)(3);

b. **to commit the offense of Use of Interstate Wires to Further Scheme to Defraud Citizens of Lexington County of their Right to Honest Services:** that is, to devise and intend to devise a scheme and artifice to defraud the citizens of Lexington County, South Carolina, of their right to the honest services of the Sheriff of Lexington County through bribery, and transmitted and caused to be transmitted by means of wire communication in interstate commerce signals, signs, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Sections 1343 and 1346;

c. **to commit the offense of Obstructing Proceedings before United States Department of Homeland Security:** that is, to corruptly influence, obstruct, and impede, and endeavor to influence, obstruct, and impede the due and proper administration of the law under which a pending proceeding to identify and process illegal aliens was being had before the United States Department of Homeland Security, in violation of Title 18, United States Code, Section 1505;

d. **to impede, impair, defeat, and obstruct the identification and processing of illegal aliens by the United States and DHS:** that is, to defraud the United States and an agency of the United States in the exercise of lawful government functions.

### Purposes of the Conspiracy

18. It was a purpose of the conspiracy for Defendant METTS to enrich himself by using and agreeing to use his official position, power, and influence in exchange for cash.

19. It was a purpose of the conspiracy for Defendant METTS to enrich others by corruptly and knowingly using METTS' position, power, and influence to obtain special treatment for certain known illegal aliens secured in the Lexington County Detention Center.

20. It was the purpose of the conspiracy for Defendant METTS to use his position, power, and influence to obtain special treatment for METTS' friends.

21. It was a purpose of the conspiracy for Defendant METTS and others to conceal the illegal cash payments received by METTS.

22. It was a purpose of the conspiracy for Defendant METTS and others to conceal METTS' improper use of the position, power, and influence as Sheriff.

23. It was a purpose of the conspiracy for Defendant METTS to use METTS' position, power, and influence to obtain special treatment for certain illegal aliens secured in the Lexington County Detention Center.

24. It was a purpose the conspiracy that Defendant METTS and his co-conspirators to impede, impair, defeat, and obstruct the lawful government functions of DHS in the identification and processing of illegal aliens.

16

## Manner and Means of the Conspiracy

25.  The manner and means of the conspiracy included, but were not limited to, the following:

      a.  Defendant METTS, while serving as the elected Sheriff of Lexington County, accepted, received, and agreed to accept and receive, things of value and promises to supply things of value, to wit, cash, from Leon and Frazier.

      b.  Defendant METTS took steps to conceal the improper use of METTS' position, power, and influence and the payments received from Frazier and Leon in order to hide the nature and scope of his dealings with Frazier and Leon.

      c.  Defendant METTS engaged in official actions as Lexington County Sheriff, and improperly used the power and influence of his position as Sheriff – including intervening in the Section 287(g) immigration enforcement program operated by the Lexington County Sheriff's Department and the Lexington County Detention Center – on behalf of and benefiting Greg Leon, known

17

illegal aliens, and restaurants that employed illegal aliens.

d. Defendant METTS obstructed, impeded, impaired, and defeated the lawful government functions of the DHS in the identification and processing of illegal aliens.

**Overt Acts in Furtherance of the Conspiracy**

26. In furtherance of the conspiracy and to achieve its purposes, the Defendant METTS, Danny Frazier, Greg Leon, and others known and unknown committed the following overt acts, among others described above in Paragraph 15, in the District of South Carolina:

On September 2, 2011, Illegal #1 was arrested in West Columbia; the following overt acts were done by members of this conspiracy in relation to his arrest:

a. Leon spoke with Frazier and asked if Frazier could assist in getting an employee who was an illegal alien released from Lexington County Detention Center.

b. After Labor Day, on Tuesday, September 6, 2011, Frazier spoke with METTS and discussed METTS assisting with providing special treatment for

an illegal alien detained in the Lexington County Detention Center. Frazier explained that the illegal alien was employed by Leon and that Leon would be generous (*i.e.*, make payments) in return for METTS' assistance. METTS agreed.

c. METTS checked with his staff to determine the status of the illegal alien in the detention center and to provide what special treatment METTS could provide.

d. After speaking with his staff, METTS contacted Frazier to instruct Frazier that METTS needed to be informed of the detention of illegal aliens quicker in order to best provide special treatment to those illegal aliens.

e. Leon provided Frazier with money for Frazier to deliver to METTS. Frazier delivered cash to METTS, which METTS accepted, in return for his agreement and attempted assistance with the illegal alien.

On September 16, 2011, Illegal #2 was arrested in West Columbia; the following overt acts were done by members of this conspiracy in relation to his arrest:

f.  On Saturday morning, September 17, 2011, Leon called Frazier to discuss Frazier contacting METTS about assisting with an illegal alien arrested the night before and placed in the Lexington County Detention Center.

g.  Frazier called METTS and discussed METTS providing special treatment for the illegal alien.

h.  METTS spoke with his staff about providing special treatment for the illegal alien.

i.  Shortly after these conversations and according to METTS' direction, a member of METTS' staff removed the hold previously placed on the illegal alien.

j.  Approximately a week later, Leon provided Frazier with money for Frazier to deliver to METTS. Frazier then delivered cash to METTS, which METTS accepted, in return for his agreement, assistance, and attempted assistance with the illegal alien.

On November 8, 2011, Illegal #3 was arrested in West Columbia; the following overt acts were done by members of this conspiracy in relation to his arrest:

    k. On November 8-9, 2011, Leon spoke with Frazier to discuss Frazier contacting METTS about assisting with an illegal alien arrested on Tuesday afternoon and placed in the Lexington County Detention Center.

    l. On Wednesday November 9, 2011, Frazier spoke with METTS and a member of METTS' command staff about providing special treatment for the illegal alien.

    m. On November 10, 2011, Frazier spoke with a member of METTS' command staff about providing special treatment for the illegal alien.

On November 13, 2011, Illegal #4 was arrested in West Columbia; the following overt acts were done by members of this conspiracy in relation to his arrest:

    n. On Monday, November 14, 2011, Frazier contacted METTS about an illegal alien arrested and placed in the Lexington County Detention Center.

21

o. Per METTS' instruction, Frazier then called a member of METTS' command staff to discuss obtaining special treatment for the illegal alien.

p. After speaking with Sheriff Department staff about the illegal alien, the member of METTS' command staff called Frazier back. Shortly thereafter, Frazier called Leon.

q. Around lunchtime, Leon called METTS directly and arranged to meet METTS at the Lexington County Sheriff's Department. At that meeting, Leon provided and METTS accepted an envelope with cash in return for METTS' agreement, assistance, and attempted assistance with illegal aliens, including the alien arrested on November 13, 2011.

r. Based on the intervention of METTS, and his staff, Illegal #4 was not fully identified, entered into the ICE system (ENFORCE/IDENT), or processed to determine the appropriate immigration treatment. Instead, the immigration

hold was removed and Illegal #4 was released without being identified or processed by ICE.

All in violation of Title 18, United States Code, Section 371.

## COUNTS 2-5
### (Use of Interstate Facility to Facilitate Bribery)

27. The allegations set forth in paragraphs 1 through 26 are repeated and realleged as if set forth fully herein.

28. On or about the respective dates set forth below, in the District of South Carolina, the Defendant METTS, Danny Frazier, Greg Leon, and others known and unknown used a facility in interstate commerce, with intent to promote, establish, carry on, and facilitate unlawful activity; to wit,

a. bribery in violation of SC Code §8-13-705; that is, METTS, directly and indirectly, knowingly accepted, received, and agreed to receive something of value as a public official in South Carolina for himself and another in return for being influenced in the discharge of his official responsibilities; and

23

b. bribery in violation of SC Code §16-9-220; that
is, METTS corruptly accepted something of value
and a promise to supply something of value as
an officer in South Carolina for his benefit in
exchange for the improper use of the power of
his position as Sheriff;

and thereafter performed and attempted to perform acts to
promote, establish, carry on, and facilitate the unlawful
activity.

| Count | Dates | Description |
|-------|-------|-------------|
| 2 | Sept. 6, 2011 | Used cellular phones to communicate followed by METTS' intervention in the Section 287(g) immigration enforcement program and acceptance of cash in return |
| 3 | Sept. 17, 2011 | Used cellular phones to communicate followed by METTS' intervention in the Section 287(g) immigration enforcement program and acceptance of cash in return |
| 4 | Nov. 9, 2011 | Used cellular phones to communicate followed by METTS' intervention in the Section 287(g) immigration enforcement program and acceptance of cash in return |
| 5 | Nov. 14, 2011 | Used cellular phones to communicate followed by METTS' intervention in the Section 287(g) immigration enforcement program and acceptance of cash in return |

All in violation of Title 18, United States Code, Sections 1952(a)(3) and 2.

### COUNTS 6-9
### (Use of Interstate Wire to Defraud the Citizens of Lexington County of Their Right to Honest Services)

1.   The allegations set forth in paragraphs 1 through 26 are repeated and realleged as if set forth fully herein.

2.   On or about the respective dates shown below, in the District of South Carolina, the Defendant METTS, Danny Frazier, Greg Leon, and others known and unknown, having devised and intending to devise a scheme and artifice to defraud, and to deprive Lexington County, South Carolina, and its citizens of their intangible right to METTS' honest services as the Sheriff of Lexington County through bribery, knowingly and intentionally transmitted and caused to be transmitted by means of wire communication in interstate commerce signals, signs, and sounds for the purpose of executing such scheme and artifice.

| Count | Dates | Description |
|---|---|---|
| 6 | Sept. 6, 2011 | Used cellular phones to communicate followed by METTS' intervention in the Section 287(g) immigration enforcement program and acceptance of cash in return |
| 7 | Sept. 17, 2011 | Used cellular phones to communicate followed by METTS' intervention in the Section 287(g) immigration enforcement program and acceptance of cash in return |
| 8 | Nov. 9, 2011 | Used cellular phones to communicate followed by METTS' intervention in the Section 287(g) immigration enforcement program and acceptance of cash in return |
| 9 | Nov. 14, 2011 | Used cellular phones to communicate followed by METTS' intervention in the Section 287(g) immigration enforcement program and acceptance of cash in return |

All in violation of Title 18, United States Code, Sections 1343, 1346, and 2.

## COUNT 10
### (Conspiracy to Harbor Illegal Aliens)

3.    The allegations set forth in paragraphs 1 through 26 are repeated and realleged as if set forth fully herein.

4.    At times unknown to the grand jury, but beginning at least in or around September 2011, and continuing thereafter, up to and including the date of this Indictment, in the District of South Carolina, the Defendant METTS, Danny Frazier, Greg Leon, and others known and unknown knowingly and intentionally combined, conspired, confederated, agreed, and had a tacit understanding to violate Section 1324(a)(1)(A)(iii) of Title 8 of the United States Code; that is, to harbor, conceal, and shield from detection, and attempt to harbor, conceal, and shield from detection, an alien knowing, and in reckless disregard of the fact, that the alien had come to, entered, and remained in the United States in violation of law.

All in violation of Title 8, United States Code, Section 1324(a)(1)(A)(v)(I).

27

A _____*True*_____ Bill

FOREPERSON

WILLIAM N. NETTLES (jnr)
UNITED STATES ATTORNEY